J-S06017-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: D.V.M.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.W., MOTHER | No. 1258 MDA 2015 |

Appeal from the Order Entered June 22, 2015
In the Court of Common Pleas of Centre County
Orphans' Court at No(s): 3956

BEFORE: PANELLA, J., MUNDY, J., and STEVENS, P.J.E.*

MEMORANDUM BY MUNDY, J.: **FILED MARCH 04, 2016**

Appellant, L.W. (Mother) appeals from the June 22, 2015 order involuntarily terminating her parental rights to her minor son, D.V.M.R., born in March 2011.[1]  After careful review, we affirm.[2]

The orphans' court summarized the factual history of this matter as follows.

> Prior to [D.V.M.R.'s] birth, since October, 2009, [Centre County Children and Youth Services (CYS)] had been providing services to alleviate personal crises [Mother] was experiencing.  She was using

---

[1] The parental rights of D.V.M.R.'s Father, G.R. (Father), were terminated by the same order.  The disposition of Father's appeal is by separate memorandum at docket number 1266 MDA 2015.

[2] The Guardian *Ad Litem* has filed a brief in support of the involuntary termination decree.

---

*Former Justice specially assigned to the Superior Court.

illegal drugs and failing to provide appropriate supervision for her children. She tested positive in multiple drug screens for cocaine, morphine and OxyContin without a proper prescription. She was charged with driving under the influence on two occasions. [Father] is [D.V.M.R.'s] natur[al] father. [Mother] and [Father] share another child, [N.R.], [D.V.M.R.'s] brother, born [in June] 2008, eight years old. [Mother] has an older daughter, [S.], who is [D.V.M.R.'s] half-sibling. [S.] was adjudicated dependent by Order entered in December, 2014.

CYS was involved with [Mother] and [Father] concerning their older son, [N.R.]. [N.R.] was adjudicated dependent in October, 2009. [Father] was incarcerated at the time [N.R.] was found dependent. Family Intervention Cris[i]s Services (FICS) was contacted to take reunification steps with [N.R.] and the efforts began with [Mother] in November, 2009 and for [Father] in March, 2010, when he was released from Blair County Correctional Facility. The reunification efforts were not successful as [Mother] had no housing, did not participate in lifestyle checks with FICS, and did not schedule sessions with reunification counselors. In August, 2010, there was no progress in reunification and on December 30, 2010, reunification services ended as the parents failed to meet the required goals.

When [D.V.M.R.] was born in March, 2011, new services were provided by FICS since [D.V.M.R.] was in the home with the parents and reunification efforts were again commenced for [N.R.] There was progress toward reunification and things went relatively well. The reunification efforts ended when [Mother] was incarcerated in December, 2011. [Father] had a warrant out for his arrest at that time and his whereabouts were unknown. [Mother] was to be incarcerated until February, 2014, and [Father] was incarcerated through September, 2012.

Orphans' Court Opinion, 6/22/15, at 1-2.

On March 10, 2014, CYS filed a petition to involuntarily terminate the parental rights of Mother and Father. A termination hearing was held on June 9, 2014, July 30, 2014, and October 31, 2014, during which the orphans' court heard the testimony of former CYS caseworker, Lindsay Schreffler; D.V.M.R.'s foster father, J.F. (Foster Father); D.V.M.R.'s foster mother, M.J.F. (Foster Mother); CYS caseworker, Tammi Eddy; Mother's maternal aunt, M.M.-K.; Mother; Father's mother, P.K. (Paternal Grandmother); and Father. On November 24, 2014, before the orphans' court ruled on the termination petition, CYS filed a petition to reopen the record in order to present new evidence concerning ongoing drug use by Mother. The orphans' court granted the petition, and additional testimony was heard on January 2, 2015. Specifically, the orphans' court heard the testimony of psychiatrist, Elmer Cupino, M.D.; and CYS caseworker, Brittany Werner. On June 22, 2015, the orphans' court entered its order terminating Mother's parental rights to D.V.M.R. Mother timely filed a notice of appeal on July 21, 2015.[3]

---

[3] Mother failed to file her concise statement of errors complained of on appeal until the following day, July 22, 2015, in contravention of Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i). We have accepted Mother's late filing in reliance on our decision in *In re K.T.E.L.*, 983 A.2d 745, 748 (Pa. Super. 2009) (holding that the appellant's failure to comply strictly with Pa.R.A.P. 1925(a)(2)(i) did not warrant waiver of her claims, as there was no prejudice to any party). Additionally, on August 17, 2015, the orphans' court filed an opinion adopting its June 22, 2015 opinion as its Rule 1925(a) opinion.

On appeal, Mother raises the following issues for our review.

> 1) [Whether t]he [orphans'] court erred in terminating the parental rights of Mother: Insufficient evidence was presented to demonstrate by a clear and convincing standard that the issues which prompted [CYS's] involvement continued to exist at the time of the hearing and could not or would not be remedied by Mother[?]
>
> 2) [Whether t]he [orphans'] court erred in reopening the record on January [2], 2015, two months after the presentation of evidence had been completed and allowing the agency to offer additional evidence not within their possession or even in existence at the time the Petition to Terminate was filed[?]
>
> 3) [Whether t]he [orphans'] court erred in denying Mother's Motion for Psychological Exam of [D.V.M.R.] to determine the impact termination would have on the child relative to his relationship with and bond to an older sibling[?]
>
> 4) [Whether t]he [orphans'] court erred in failing to consider the impact termination would have on the bond between the minor child and his older sibling[?]
>
> 5) [Whether t]he [orphans'] court erred in relying on the testimony of a caseworker to opine on the impact termination would have on the minor child relative to his parental bond with Mother[?]

Mother's Brief at 1-2.

We consider Mother's claims mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error

- 4 -

of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as

Section 2511(b), in order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the orphans' court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> …
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> …
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). "[A] parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014), *citing In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012).

Instantly, the orphans' court found that Mother's incapacity, abuse, neglect, or refusal, has caused D.V.M.R. to be without essential parental care. Orphans' Court Opinion, 6/22/15, at 9. The orphans' court emphasized Mother's "criminal issues, frequent incarceration, drug abuse, and lack of a stable home and employment," and concluded that she will not be able to remedy these problems. *Id.*

In her first and second issues on appeal, Mother argues that she is presently capable of caring for D.V.M.R., and that none of the issues that prevented her from caring for D.V.M.R. in the past continue to exist. Mother's Brief at 6-9. Mother concedes that evidence was presented on January 2, 2015, which indicated that she was continuing to use illegal

drugs. *Id.* at 10. However, Mother insists that the orphans' court erred by reopening the record and considering this evidence. *Id.* at 10-11. According to Mother, "[t]o allow [CYS] to re-open the record any time more damning evidence is available would place parents in an impossible situation, whereby they would be burdened with defending allegations in perpetuity." *Id.* at 10.

After a thorough review of the record, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Mother's parental rights to D.V.M.R. During the termination hearing, on July 30, 2014, Mother testified that she was incarcerated from December 9, 2011, until February 2, 2014. N.T., 7/30/14, at 29, 43. Mother acknowledged that she has a lengthy criminal history, and that she has been incarcerated on several prior occasions, including periods of incarceration in 2001, 2002, and 2010. *Id.* at 66-74. Since being released from her most recent incarceration, Mother reported that has she been working as a housekeeper at a hotel, and that she rented a townhouse. *Id.* at 12, 14. With respect to her illegal drug use, Mother admitted that she continued to use heroin until she found out that she was pregnant with D.V.M.R. *Id.* at 48-49. However, Mother insisted that she has been drug-free for about four years, and that she would like to go back to school and become a drug and alcohol counselor. *Id.* at 14-16. Mother noted that she is on probation, and that

she has been drug tested by her probation officer. *Id.* at 30. Mother reported that she has passed all of her drug tests. *Id.*

On January 2, 2015, CYS presented the testimony of caseworker, Brittany Werner. Ms. Werner testified that she received a call on November 9, 2014, indicating that there was "a child in the ER department that needed somewhere to go, someone to stay with because [his] mother, [Mother], was going to be admitted to the psychiatric department." N.T., 1/2/15, at 55. Ms. Werner spoke with Mother, who indicated that she recently had used cocaine, and that she used the cocaine "as an upper since her Adderall was a downer for her." *Id.* at 56. It was Ms. Werner's understanding that Mother also tested positive for cocaine at that time.[4] *Id.* Ultimately, Mother was not admitted to the psychiatric department. *Id.* at 58.

Given the foregoing, the record supports the conclusion of the orphans' court that Mother is incapable of providing D.V.M.R. with essential parental care, control, or subsistence necessary for D.V.M.R.'s physical or mental well-being. Moreover, Mother cannot, or will not, remedy her parental incapacity. Despite Mother's contentions to the contrary, it is clear that the circumstances which prevented her from caring for D.V.M.R. continue to exist. Mother continues to engage in illegal activity, namely

_____

[4] CYS presented a copy of Mother's drug test results, which showed a positive screen for cocaine metabolite on November 9, 2014. *See* Petitioner's Exhibit 2, 1/2/15.

drug use, which both risks the safety of D.V.M.R., and may result in additional periods of incarceration. While Mother insists that it was somehow unfair or improper for the orphans' court to reopen the record and consider the evidence of her recent drug use, Mother fails to cite any authority which supports this proposition. *See generally* Mother's Brief at 10-11. Thus, we deem this claim waived. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) ("where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived[]"), *appeal denied*, 24 A.3d 364 (Pa. 2011), *quoting* **In re A.C.**, 991 A.2d 884, 897 (Pa. Super. 2010).

We next consider whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015), *quoting In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

Here, the orphans' court found that terminating the parental rights of Mother and Father would best serve the needs and welfare of D.V.M.R. Orphans' Court Opinion, 6/22/15, at 10. The orphans' court explained that it considered the bond between D.V.M.R. and his parents, and concluded that D.V.M.R. would not suffer emotionally if parental rights are terminated. *Id.* The orphans' court observed that D.V.M.R. shared a stronger bond with his foster parents. *Id.* Finally, the orphans' court noted that it would be best for D.V.M.R. to continue residing with his foster parents, even though this will prevent D.V.M.R. from residing with his brother N.R. *Id.* at 11. The orphans' court expressed hope that D.V.M.R.'s foster parents would work with N.R.'s foster parents and with CYS to foster a relationship between D.V.M.R. and N.R. *Id.*

- 11 -

In her third, fourth, and fifth issues on appeal, Mother argues that it was improper for the orphans' court to terminate her parental rights without first conducting a bonding evaluation of D.V.M.R. and his brother N.R., and a bonding evaluation of D.V.M.R. and Mother. Mother's Brief at 11-13. Mother asserts that there was "no competent testimony" concerning D.V.M.R.'s bond with Mother, and that the orphans' court erred by relying on the testimony of the CYS caseworker that D.V.M.R. would not be harmed if Mother's parental rights were terminated. *Id.* at 12. Mother insists that D.V.M.R. is strongly bonded with both her and N.R. *Id.* at 12-13.

We again discern no abuse of discretion. CYS caseworker, Tammi Eddy, testified that she did not believe that D.V.M.R. would suffer emotional harm if the parental rights of Mother and Father were terminated. N.T., 6/9/14 (Part 2), at 100. Ms. Eddy explained that she has attended approximately four visits between D.V.M.R. and his parents. *Id.* at 116-17. In addition, Ms. Eddy has transported D.V.M.R. back from visits. *Id.* at 95-96. While being driven back after a visit, D.V.M.R. frequently asks when they are going to be home, and says, "I want Mommy [J.], I want my mommy," meaning Foster Mother. *Id.* at 96. In contrast, Ms. Eddy described an incident during which she arrived at the foster home, and D.V.M.R. mistakenly believed that she was there to take him to a visit with his parents. *Id.* at 96. D.V.M.R. "ran upstairs screaming [']I don't want to

- 12 -

go, I don't want to go.['] He then started throwing books at the [foster parents'] daughter."[5] *Id.* at 96-97.

Concerning D.V.M.R.'s bond with his brother N.R., Foster Mother testified that D.V.M.R. and N.R. initially were placed together in her home. *Id.* at 39-40. However, N.R. engaged in numerous inappropriate behaviors, including acts of violence against D.V.M.R.. *Id.* at 41-43. Foster Mother and Foster Father struggled to ensure D.V.M.R.'s safety, and Foster Mother called CYS asking for assistance. *Id.* at 40, 42, 52. As a result, N.R. was sent to be evaluated at a facility called Kids Peace. *Id.* at 53-54. During N.R.'s time at Kids Peace, it was determined that N.R. should not reside with other children. *Id.* at 56. Thus, N.R. was placed in the care of Paternal Grandmother. *Id.* Foster Mother noted that N.R. was present during some of D.V.M.R.'s visits with Mother and Father, and that D.V.M.R. is more willing to attend visits if he knows N.R. will be there. *Id.* at 49-50, 61-62. Foster Mother indicated that she would support D.V.M.R. and N.R. maintaining a relationship, even after she and Foster Father adopt D.V.M.R.. *Id.* at 62.

Thus, the record supports the conclusion of the orphans' court that it would best serve D.V.M.R.'s needs and welfare to terminate Mother's parental rights. D.V.M.R. was removed from Mother's care in December of

_____

[5] While describing this incident, Ms. Eddy used N.R.'s first name rather than D.V.M.R.'s first name. However, it is clear from the context that she was referring to D.V.M.R..

2011, when he was about nine months old. D.V.M.R. was placed with his current foster parents in March of 2012, and has resided with them continuously since that time. N.T., 6/9/14 (Part 1), at 34, 88. While Mother suggests that the orphans' court should have procured a bonding evaluation, it is well-settled that a court in a termination proceeding "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." *In re K.K.R.-S.*, 958 A.2d 529, 534 (Pa. Super. 2008) (citation omitted). The orphans' court was well within its discretion when it relied on the testimony of Ms. Eddy, among others, to conclude that D.V.M.R. has no significant bond with Mother, and that D.V.M.R. would not suffer emotional harm if Mother's parental rights were terminated.

Moreover, it was proper for the orphans' court to conclude that D.V.M.R.'s relationship with N.R. should not prevent Mother's parental rights from being terminated. While Mother suggests that the orphans' court failed to consider the impact that terminating Mother's parental rights would have on this sibling relationship, the orphans' court's opinion belies this assertion. We agree with the orphans' court that whatever bond the brothers share is outweighed in the instant matter by other concerns, including D.V.M.R.'s bond with his foster parents, D.V.M.R.'s need for permanence and stability, and Mother's ongoing drug use. *See In re R.N.J.*, 985 A.2d 273 (Pa. Super. 2009) (affirming the orders terminating the appellant's parental rights to two of her children, and changing the permanency goals of two of

the appellant's other children to permanent legal custody, based on the unique circumstances of each child). As observed by the orphans' court, Foster Mother indicated during the termination hearing that she would support D.V.M.R. and N.R. maintaining a relationship, even after she has adopted D.V.M.R..[6]

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Mother's parental rights to D.V.M.R. **See T.S.M.**, **supra**. Accordingly, we affirm the June 22, 2015 order of the orphans' court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/4/2016

---

[6] Similarly, Foster Father stated, "I would make sure that those boys stayed in contact with each other, seen [sic] each other. I have no problem with them communicating with each other…. I assure you that … they will be in contact with each other." N.T., 6/9/14 (Part 2), at 26.